**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Plaintiff, | 26 Civ. 4042 |
| v. | **COMPLAINT** |
| DAVID MCJANNET and DOME SYSTEMS, INC., | |
| Defendants. | |

International Business Machines Corporation ("IBM" or the "Company"), by its undersigned attorneys, upon personal knowledge with respect to itself and its actions and otherwise on information and belief, alleges as follows:

**Nature of the Action**

1.      Defendant David McJannet is the former Chief Executive Officer of HashiCorp, Inc. ("HashiCorp") and one of its largest former stockholders.  McJannet pocketed proceeds well in excess of one hundred million dollars from the sale of HashiCorp to IBM, only to turn around and quickly violate the contractual commitments he made to IBM as part of that acquisition.  As an express inducement for IBM to acquire HashiCorp, McJannet agreed with IBM that for three years—through February 27, 2028—he would not compete against or solicit the customers or employees of HashiCorp.  Yet, within months of leaving his post-acquisition employment with IBM, and not even a year into that three-year period, McJannet did (and is continuing to do) exactly what he agreed he would not do: compete against HashiCorp.

2.      In January 2026, McJannet secretly formed a new company, Defendant Dome Systems, Inc., to compete against IBM and its wholly-owned subsidiary, HashiCorp.  Following the public launch of Dome Systems in April 2026, McJannet and the new company's

seed investors made public statements that highlight McJannet's violation of his contractual non-competition obligations to IBM.  One of those investors, for example, touted that Dome Systems was being "[b]uilt by a team that's done this before," explaining that: "Dome Systems co-founders Dave McJannet and Marc Holmes [HashiCorp's former Chief Marketing Officer] *have seen and solved this problem before*, and we saw their success firsthand during the cloud-era when we were privileged to back them at HashiCorp."[1]  In fact, underscoring the similarity between HashiCorp and McJannet's new venture, each of the principal outside investors in Dome Systems had previously invested in HashiCorp.

3.     In an April 21, 2026 CNBC interview, McJannet himself acknowledged the "consistency" and "similarity" between Dome Systems and HashiCorp, in response to the interviewer's observation that Dome Systems "seems like a continuation of some of the things you were working on at HashiCorp."[2]

4.     IBM acquired HashiCorp in February 2025, along with its valuable suite of existing and future products, which were positioned at the forefront of AI adoption. HashiCorp is in the business of providing products and solutions that manage, secure, and facilitate the operation of customers' digital infrastructure.  Its product suite is central to how modern enterprises build, deploy, and operate their technology environments.  This includes infrastructure provisioning and automation, infrastructure management, secrets management and data protection, identity-based security and access control, workload orchestration, and secure

---

[1] Byron Deeter & Lauri Moore, *Dome Systems: The Operational Control Plane for the Agentic Enterprise*, Bessemer Venture Partners (Apr. 16, 2026), https://www.bvp.com/news/dome-systems-the-operational-control-plane-for-the-agentic-enterprise (emphasis added).

[2] CNBC, *Dave McJannet, Dome Systems CEO: A Fortt Knox Update*, at 0:20-0:33, 0:49-0:52 (Apr. 21, 2026), https://www.cnbc.com/video/2026/04/21/dave-mcjannet-dome-systems-ceo-a-fortt-knox-update.html.

remote access to systems and applications. These products are essential to how businesses deploy and manage software on and across their cloud and on-premises environments, and HashiCorp's offerings are designed to work seamlessly across each of those environments.

5. HashiCorp's products have for years included features used to manage and secure applications that incorporate artificial intelligence ("AI"), including by enabling automated, secure, and reliable provisioning, deletion, and governance of the credentials, secrets, and infrastructure on which those applications depend. As AI and agent-based or "agentic" AI technologies have continued to evolve, HashiCorp has developed and marketed—and continues to develop and market—products and features specifically aimed at helping customers control, secure, and manage the environments in which AI applications and AI agents operate, including the identities those agents use, the secrets they access, and the infrastructure on which they run.

6. HashiCorp's early focus on the intersection between AI and digital infrastructure management was an important part of the value proposition motivating IBM's acquisition. As IBM explained in its press release announcing the acquisition, HashiCorp's "products automate and secure the infrastructure that underpins hybrid cloud applications and generative AI." In order to protect the goodwill of its acquisition, IBM and certain major HashiCorp stockholders and key executives, McJannet foremost among them, entered into agreements restricting those individuals' ability to diminish the value of IBM's investment by competing with or soliciting the customers or employees of HashiCorp.

7. Thus, in exchange for proceeds well in excess of one hundred million dollars as part of IBM's acquisition, McJannet agreed that for three years he would not work for, or affiliate himself with, any business operating in the same business area as HashiCorp.

3

8.    Despite his clear contractual obligations, McJannet promptly disregarded his commitments by founding Dome Systems, which, like HashiCorp, offers software designed to provide the processes, practices, frameworks, and tools for businesses to govern and manage digital infrastructure.  And like HashiCorp, Dome Systems is marketing its digital infrastructure management software to customers deploying agentic AI.

9.    McJannet is now the CEO of Dome Systems.  On April 16, 2026, McJannet publicly announced that he was launching Dome Systems out of "stealth," suggesting that he had been working on his new endeavor for some time.  Dome Systems announced that it was backed by three primary institutional investors—each of which were previous backers of HashiCorp.  These investors issued public statements about the launch of Dome Systems and the new company's plans to offer software designed to allow enterprises to govern and manage AI agents across their digital infrastructure.[3]  Dome Systems' newly announced product is designed for infrastructure management, in direct competition with products offered by HashiCorp, the company McJannet had just sold to IBM.

10.    McJannet's founding of and employment by Dome Systems is a plain violation of his April 24, 2024 Holder Agreement with IBM (the "Holder Agreement"), in which he agreed that for three years from closing he would not compete against HashiCorp and its business of providing software for managing digital infrastructure, including, but not limited to "identity-based security and secrets management."  McJannet also agreed that for three years

---

[3] RedPoint Ventures, LinkedIn (Apr. 16, 2026), https://www.linkedin.com/posts/redpointventures_were-thrilled-to-be-co-leading-dome-systems-activity-7450591865420140544-pquf; Byron Deeter & Lauri Moore, *Dome Systems: The Operational Control Plane for the Agentic Enterprise*, Bessemer Venture Partners (Apr. 16, 2026), https://www.bvp.com/news/dome-systems-the-operational-control-plane-for-the-agentic-enterprise.

from the closing he would not provide any products involving the provisioning and management of digital infrastructure to any customers or active prospective customers of HashiCorp and that he would not solicit or hire any HashiCorp employees.

11.     McJannet expressly acknowledged that his contractual commitments were reasonably designed to protect the value of the business that IBM acquired for more than $6 billion by ensuring that—for a limited time—McJannet would not compete with HashiCorp or solicit its customers and employees, given his access to and knowledge about HashiCorp's confidential information, products and plans, customer base, and employees. McJannet acknowledged that he gave these commitments as an inducement for IBM to enter into the agreement by which it acquired HashiCorp, and through which McJannet reaped a personal windfall.

12.     The restrictions in the Holder Agreement that McJannet agreed to in selling his substantial ownership interests in HashiCorp prohibit McJannet from continuing to work for or provide services to Dome Systems as its CEO or in *any* capacity until February 27, 2028.

13.     In addition to violating the non-compete obligation in his Holder Agreement, McJannet also violated his promise not to solicit or hire anyone who is—or, in the six months prior to such solicitation or hiring, was—an employee of HashiCorp.

14.     Dome Systems' Chief Operating Officer is Marc Holmes, who was the Chief Marketing Officer of HashiCorp when McJannet was HashiCorp's CEO. Holmes left HashiCorp on May 27, 2025, meaning that McJannet was prohibited from soliciting his services until November 27, 2025. Dome Systems, however, was incorporated only weeks after that six-month period ended, and mere months before Dome publicly announced it had raised $14

5

million.  Those circumstances strongly suggest that McJannet improperly solicited Holmes to join McJannet's new competitive endeavor, which would become Dome Systems.

15.     IBM accordingly seeks to enjoin McJannet from continuing in his employment with Dome Systems or providing services to Dome Systems prior to the expiration of his three-year non-competition period in the Holder Agreement, through February 27, 2028. IBM further seeks to enjoin McJannet from breaching his customer and/or employee non-solicitation obligations.  McJannet himself agreed that such relief is appropriate, acknowledging in the Holder Agreement that IBM would be entitled to equitable relief to bar him from violating his obligations, because any remedy at law would be inadequate and damages would be difficult to measure.  Dome Systems has been and is aware of McJannet's contractual obligations to IBM not to compete with HashiCorp or solicit its customers.  By employing McJannet to develop and offer the very types of software products which McJannet agreed he would not work on for a three-year period following IBM's acquisition of HashiCorp, Dome Systems intentionally caused and procured McJannet's wrongful violation of his agreement with IBM.  Accordingly, IBM seeks to enjoin Dome Systems from its tortious interference with McJannet's contractual obligations to IBM.  Specifically, IBM seeks to enjoin Dome Systems from procuring McJannet's wrongful breach of obligations that bar him from competing with HashiCorp to develop and offer digital infrastructure management software (including in connection with agentic AI) and from selling those products to HashiCorp customers.

**The Parties**

16.     IBM is a corporation organized under the laws of the State of New York with its principal place of business located in Armonk, New York, within the Southern District of New York.

6

17.     David McJannet is an individual who resides in the state of California.

18.     Dome Systems, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business located in Menlo Park, California.

### Jurisdiction and Venue

19.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

20.     The Court has personal jurisdiction over McJannet because he consented to exclusive jurisdiction in either the United States District Court for the Southern District of New York or any New York State court sitting in the County of New York for the resolution of all disputes arising under, or relating to, the Holder Agreement.

21.     The Court has specific personal jurisdiction over Dome Systems because the claims against Dome Systems arise out of and relate to Dome Systems' conduct and activities within the Southern District of New York.

22.     Venue properly lies in this Court under 28 U.S.C. § 1391 because IBM's headquarters and principal place of business are situated within this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

### Relevant Facts

### IBM

23.     IBM, one of the most widely recognized technology companies in the world, is a globally integrated enterprise that offers information technology and business process services, including computer hardware, software, and other advanced information technologies, to a wide range of customers.

24.     Like most technology companies and large global businesses, IBM relies upon trade secrets and other confidential information in developing and implementing its acquisition and growth plans and strategies; its competitive sales campaigns; and its product offering, marketing and sales strategies.  One of the ways IBM grows its product portfolio is through strategic acquisitions of other technology companies.

25.     HashiCorp is a wholly owned subsidiary of IBM.  HashiCorp provides software tools to automate the provisioning, security, networking, and running of technology infrastructure and the information systems that operate on that infrastructure.  Among these tools are Terraform, Vault, Nomad, Consul, Waypoint, Packer, Boundary, and Radar.

26.     Each of these offerings includes features related to the management and governance of agentic AI.  In addition, HashiCorp has been developing and planning the launch of a product specifically focused on agentic AI infrastructure for over a year, and since before the February 27, 2025 closing of the IBM-HashiCorp acquisition.  Consistent with HashiCorp's principal business of offering products designed to facilitate customers' management, security, and control of their information infrastructure, these existing and forthcoming products enable customers to put technical guardrails and controls in place so AI agents operate according to the customer's policies and procedures.  These products provide customers with the ability to track their AI agents as they take actions throughout customers' digital environments, ensuring that tasks are assigned to the appropriate AI agent, that AI agents are able to use company-approved resources, and that the AI agents do not act outside their prescribed roles.

27.     In May 2025, after months of development work, HashiCorp announced the launch of Terraform MCP (Model Context Protocol), which was designed to enable AI agents to assist with infrastructure management.  In September 2025, HashiCorp announced its

ongoing development of InfraGraph, a new software product designed for businesses to manage and govern agentic AI within their digital environments. HashiCorp is continuing to develop, and will continue launching, new offerings for agentic infrastructure management.

**The IBM-HashiCorp Transaction**

28. HashiCorp has long been a leader in the infrastructure software market, helping customers automate and secure the infrastructure that underpins software applications and generative AI.[4] As generative AI adoption continues, HashiCorp's products only become more essential for businesses to properly manage their digital environments.

29. IBM's acquisition of HashiCorp aligned with IBM's history of strategic investment in software allowing customers to manage, observe, and monitor their infrastructure and optimize the performance of their applications.[5] IBM identified HashiCorp as a potential target for acquisition because of HashiCorp's ability to continue developing infrastructure management software at the cutting-edge of technology.

30. For HashiCorp, the acquisition gave it an opportunity to integrate HashiCorp offerings into IBM products, allowing customers to better and more comprehensively automate their infrastructure management.[6]

31. McJannet, as a substantial HashiCorp stockholder and its CEO, received proceeds well in excess of one hundred million dollars in the acquisition in exchange for his

---

[4] Press Release, Hanna Scalzo, IBM, *IBM Completes Acquisition of HashiCorp, Creates Comprehensive, End-to-End Hybrid Cloud* Platform (Feb. 27, 2025), https://newsroom.ibm.com/2025-02-27-ibm-completes-acquisition-of-hashicorp,-creates-comprehensive,-end-to-end-hybrid-cloud-platform.

[5] *Id*.

[6] Press Release, Armon Dadgar, HashiCorp, *HashiCorp Officially Joins the IBM Family* (Feb. 27, 2025), https://www.hashicorp.com/en/blog/hashicorp-officially-joins-the-ibm-family.

ownership interests.  In return, McJannet agreed to restrictive covenants designed to protect the goodwill that IBM purchased in the acquisition.

32.     IBM and HashiCorp formally agreed to the acquisition on April 24, 2024, when both parties signed the transaction documents.

33.     The transaction closed on February 27, 2025, with IBM acquiring HashiCorp for approximately $6.4 billion.

**The IBM-McJannet Holder Agreement**

34.     In connection with McJannet's sale of his substantial ownership interest in HashiCorp, IBM and McJannet entered into the Holder Agreement dated April 24, 2024, a true and correct copy of which is attached hereto as Exhibit A.

35.     The Holder Agreement states that a material aspect of IBM's decision to acquire HashiCorp was "the acquisition of [HashiCorp's] goodwill" and that the value of that goodwill was reflected in the purchase price that IBM paid to acquire HashiCorp and McJannet's shares.  (Holder Agreement p. 1.)  McJannet also acknowledged that his entry into the Holder Agreement—and his commitment to abide by the restrictions it contained—was designed to "induce" IBM to enter into the merger agreement by which it acquired HashiCorp.

36.     Accordingly, in order to induce the proceeds well in excess of one hundred million dollars that he received for the sale of his ownership interest in HashiCorp, and to ensure that IBM enjoyed the goodwill and associated benefits of the acquisition, McJannet agreed to restrictive covenants barring him from (a) competing with HashiCorp or (b) soliciting its current or potential customers in connection with products that allow customers to provision and manage their digital infrastructure.

37.     In particular, in the noncompetition section of the Holder Agreement, McJannet agreed that, for a period of three years following the close of IBM's acquisition of

HashiCorp, he would not work for, manage, or be employed by any business except IBM that operates in the "Business Area," defined as:

> [A]ny business or open source project relating to designing, developing, delivering, managing, administering, monitoring, distributing, providing services for, marketing, licensing, selling or reselling information systems software, cloud based or provided services, or information appliances comprising hardware and software, in each case that provide the processes, practices, frameworks, methods and associated tools that allows organizations to provision and manage infrastructure, specifically using infrastructure as code techniques, or identity-based security and secrets management of cloud infrastructure.

(Holder Agreement § 1(a).)

38.    The Holder Agreement permits McJannet to work as an employee of a multi-divisional business, if the division in which he is employed is not engaged in the Business Area. (*Id.*)

39.    Similarly, in the "Non-Solicitation of Customers or Clients" section of the Holder Agreement, McJannet agreed that, during the three-year non-competition period, he would not "directly or indirectly, provide Business Area products and services . . . to any entity that at such time is, or at any time in the one (1) year period prior to such time had been a customer . . . . or [an] active prospective customer" of HashiCorp, absent prior written consent from IBM.  (*Id.* § 2.)

40.    Further, in the "Non-Solicitation of Employees and Consultants" section of the Holder Agreement, McJannet agreed that, during the three-year non-competition period, he would not "directly or indirectly, solicit influence, entice or encourage any person who at such time is, or who at any time in the six (6) month period prior to such time had been, an employee of or consultant to [HashiCorp]." (*Id.* § 3.)

41.     Relatedly, in the "No-Hire" section of the Holder Agreement, McJannet also agreed that neither McJannet nor any business for which McJannet works would "directly or indirectly, hire or attempt to hire . . . any person who at such time is, or who at any time in the six (6) month period prior to such time had been, employed by or providing services to [HashiCorp]." (*Id.* § 4.)

42.     McJannet acknowledged and agreed that "the covenants and agreements contained in [the Holder Agreement] are reasonable and are not more restrictive or broader than necessary to protect the interests of the parties hereto, and would not achieve their intended purpose if they were on different terms or for periods of time shorter than the periods of time provided herein." (*Id.* § 9.)

43.     McJannet also acknowledged and agreed that legal remedies would not provide IBM with adequate relief for breach of any of the provisions of the Holder Agreement, and that such a breach would entitle IBM, without the necessity of showing economic loss or actual damages, to obtain equitable relief, including a temporary restraining order and a temporary or permanent injunction, and attorneys' fees. (*Id.* § 7.)

44.     McJannet also agreed that he would provide IBM written notice within two weeks of commencing any non-publicly announced employment with any person or entity at any time during his three-year non-competition period. (*Id.* § 11.)

45.     McJannet further acknowledged that the Holder Agreement is not an employment agreement and that nothing in the Holder Agreement should be construed as an agreement to provide employment to McJannet. (*Id.* § 13.)

46.     IBM has fully complied with its obligations under the Holder Agreement.

**McJannet Breaches The Holder Agreement by Launching Dome Systems**

47.    Dome Systems incorporated in the State of Delaware on January 5, 2026. McJannet incorporated Dome Systems approximately three months after he left IBM.  Following the February 27, 2025 closing of IBM's acquisition of HashiCorp, McJannet continued working for HashiCorp, before becoming an IBM employee on June 1, 2025 and resigning from IBM effective September 1, 2025.

48.    Some new technology businesses begin operations with limited public visibility to hide their products, business model, and team from the public and thereby avoid drawing competitors' attention.  This is often referred to as "stealth mode."  While in stealth mode, companies like Dome Systems may raise capital from investors, develop and design products and business strategy, recruit employees, and begin working with prospective customers.

49.    On April 16, 2026, Dome Systems exited stealth mode, and its primary institutional investors publicly announced the company, its agentic AI infrastructure platform, and that it had already received $14 million in funding.  One institutional investor who previously invested in HashiCorp touted Dome Systems as "[b]uilt by a team that's done this before," referring to McJannet and Holmes and their work at HashiCorp.[7]  The announcement continued: "Dome Systems co-founders Dave McJannet and Marc Holmes *have seen and solved this problem before*, and we saw their success firsthand during the cloud-era when we were privileged to back them at HashiCorp."[8]

---

[7] Byron Deeter & Lauri Moore, *Dome Systems: The Operational Control Plane for the Agentic Enterprise*, Bessemer Venture Partners (Apr. 16, 2026), https://www.bvp.com/news/dome-systems-the-operational-control-plane-for-the-agentic-enterprise.

[8] *Id.* (emphasis added).

13

50.    April 16, 2026 was the first date IBM became aware of McJannet's employment with Dome Systems, because McJannet separately breached his obligation to notify IBM of his acceptance and commencement of employment with Dome Systems during his three-year non-competition period.  (Holder Agreement § 11.)

51.    On April 21, 2026, CNBC interviewed McJannet about Dome Systems. The interviewer began by explaining that Dome Systems "seems like sort of a continuation of some of the things you were working on at HashiCorp."  McJannet did not disagree, instead acknowledging that there was "consistency" and "similarity" between Dome Systems and HashiCorp.[9]  When the interviewer asked McJannet about whether Dome Systems would be competing with HashiCorp, McJannet admitted that "philosophically . . . the patterns look familiar."[10]

52.    Dome Systems has one product, and it competes directly with HashiCorp's infrastructure management offerings.  Like HashiCorp's product suite, Dome Systems' offering is designed to manage customers' digital infrastructure.  Among other things, Dome Systems' product facilitates customers' application governance, workload orchestration, secrets management, and identity-based security and access control.  And just like a number of HashiCorp's own products and features, Dome Systems' infrastructure management product is focused on agentic AI.  On its website, for example, Dome Systems claims that "a secrets vault" will not properly secure AI agents, as Dome Systems claims its products will.  What Dome Systems leaves unsaid is that the leading secrets vault is the HashiCorp Vault, which IBM and

---

[9] CNBC, *Dave McJannet, Dome Systems CEO: A Fortt Knox Update*, at 0:20-0:33, 0:49-0:52 (Apr. 21, 2026), https://www.cnbc.com/video/2026/04/21/dave-mcjannet-dome-systems-ceo-a-fortt-knox-update.html.
[10] *Id.* 11:03-06, 11:47-51.

HashiCorp market as a credential management tool for AI agents. Dome Systems' Model, which is a component of the platform, directly competes with features of HashiCorp's HCP Terraform. Both automatically apply policy-as-code to govern AI agent behavior. And Dome Systems' platform directly competes with HashiCorp's forthcoming InfraGraph product, which enables AI agents to access data across an organization's hybrid or multi-cloud environment.

53. HashiCorp and IBM were designing and developing the technology behind these products both at the time IBM acquired HashiCorp and when McJannet worked for HashiCorp (and subsequently IBM) following that acquisition.

54. For months prior to the close of the transaction, HashiCorp and IBM engaged in detailed technical discussions about HashiCorp's plans to develop software for the management of agentic AI infrastructure. These plans were an important part of HashiCorp's value proposition and were therefore an integral component of the goodwill for which IBM paid and which McJannet acknowledged in the Holder Agreement that IBM is entitled to enjoy and protect.

55. HashiCorp has thousands of customers across geographies, industries, and sizes, many of which are located and conduct business in New York. HashiCorp faces competition for all of these customers from infrastructure software product providers like Dome Systems.

56. Dome Systems already has announced that it is onboarding "a select group of enterprises" to its agentic AI infrastructure software product. Dome Systems, on information and belief, has been and is in the process of soliciting and selling to HashiCorp customers, including those based in New York. As widespread adoption of agentic AI technology continues, Dome Systems poses a competitive threat directly against HashiCorp for the same

work for the same customer base—including customers currently using HashiCorp software products and prospective HashiCorp customers.

57.    McJannet, as CEO of Dome Systems, is therefore in continuing violation of the Holder Agreement through his work at Dome Systems, despite his promise to IBM, in exchange for proceeds well in excess of one hundred million dollars that he received in the transaction, not to work in the Business Area through February 27, 2028.

58.    Further, if McJannet is allowed to continue working as CEO of Dome Systems, as he intends to do, he will continue to violate obligations not to solicit HashiCorp customers (through February 27, 2028) under the Holder Agreement.

59.    As CEO of Dome Systems, McJannet's soliciting and hiring of Holmes as Dome Systems' COO violates McJannet's promise in the Holder Agreement not to solicit or hire any current or former HashiCorp employees within six months of their departure from HashiCorp.

60.    Dome Systems, which was co-founded by McJannet and Holmes, has at all times since its incorporation in January 2026 been aware of McJannet's contractual obligations to IBM barring him from competing against HashiCorp and soliciting business from or providing services to its customers.  By employing McJannet as its CEO, Dome Systems is directly and intentionally procuring, enabling, and contributing to McJannet's breaches of the Holder Agreement.

## COUNT I
### Breach of the Holder Agreement – Non-Compete (McJannet)

61.    IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 60 of the Complaint.

16

62. The Holder Agreement is an enforceable agreement that imposes upon McJannet certain contractual obligations.

63. McJannet entered into the Holder Agreement as an inducement for IBM to acquire HashiCorp, in connection with which McJannet received proceeds well in excess of one hundred million dollars by selling to IBM his substantial ownership interest in HashiCorp.

64. McJannet has breached the terms of the Holder Agreement by, among other things, founding and working for Dome Systems without waiting for expiration of the three-year non-competition period to which he expressly agreed.

65. If McJannet is not enjoined from continuing in his role as Dome Systems' CEO, and thereby violating his Holder Agreement, IBM will be irreparably injured inasmuch as McJannet, in performing his job at Dome Systems, will impair, diminish, and/or undermine the goodwill that IBM purchased through its acquisition of HashiCorp, and otherwise harm the legitimate business interests of IBM, including the protection of its trade secrets, confidential information, and customer goodwill.

66. IBM has fully complied with its obligations under the Holder Agreement.

## COUNT II
### Breach of the Holder Agreement – Customer Non-Solicitation (McJannet)

67. IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 60 of the Complaint.

68. The Holder Agreement is an enforceable agreement that imposes upon McJannet certain contractual obligations.

69. McJannet entered into the Holder Agreement as an inducement for IBM to acquire HashiCorp, in connection with which McJannet received proceeds well in excess of one hundred million dollars by selling to IBM his substantial ownership interest in HashiCorp.

17

70.    As CEO of Dome Systems, McJannet is breaching and will continue to breach the Holder Agreement by directly or indirectly providing the type of products to current or active prospective HashiCorp customers that he agreed not to provide during the three-year non-competition period.

71.    If McJannet is not enjoined from violating the covenant against soliciting customers, IBM will be irreparably injured, inasmuch as McJannet, in providing competing services to HashiCorp customers, will impair, diminish, and/or undermine the goodwill that IBM purchased through its acquisition of HashiCorp, and otherwise harm the legitimate business interests of IBM, including the protection of its trade secrets, confidential information, and customer goodwill.

72.    IBM has fully complied with its obligations under the Holder Agreement.

### COUNT III
### Breach of the Holder Agreement – Employee Non-Solicitation and Hiring (McJannet)

73.    IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 60 of the Complaint.

74.    The Holder Agreement is an enforceable agreement that imposes upon McJannet certain contractual obligations.

75.    McJannet entered into the Holder Agreement as an inducement for IBM to acquire HashiCorp, in connection with which McJannet received proceeds well in excess of one hundred million dollars by selling to IBM his substantial ownership interest in HashiCorp.

76.    As CEO of Dome Systems, McJannet has breached the Holder Agreement by employing Holmes as COO and thereby violating his agreement to neither solicit nor hire current or former HashiCorp employees within six months of their departure from the company.

77.     If McJannet is not enjoined from continuing his violation of the Holder Agreement by employing Holmes, IBM will be irreparably injured because McJannet will continue to deprive IBM of the benefit of its bargain for the acquisition of HashiCorp and impair, diminish, and/or undermine the goodwill that IBM purchased through its acquisition of HashiCorp.

## COUNT IV
### Breach of Common Law Covenant (McJannet)

78.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 60 of the Complaint.

79.     New York common law protects the transfer of goodwill in connection with the sale of a business by imposing a covenant by the seller not to solicit former customers.

80.     As CEO of Dome Systems, McJannet has breached and will continue to breach his common law covenant by soliciting and selling Dome Systems' product to HashiCorp customers.

81.     If McJannet is not enjoined from breaching his common law covenant, IBM will be irreparably injured, inasmuch as McJannet, in providing competing services to HashiCorp customers, will impair, diminish, and/or undermine the goodwill that IBM purchased through its acquisition of HashiCorp, and otherwise harm the legitimate business interests of IBM, including the protection of its trade secrets, confidential information, and customer goodwill.

## COUNT V
### Tortious Interference With the Holder Agreement (Dome Systems)

82.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 60 of the Complaint.

19

83.     The Holder Agreement is an enforceable agreement that imposes upon McJannet certain contractual obligations.

84.     McJannet entered into the Holder Agreement as an inducement for IBM to acquire HashiCorp, in connection with which McJannet received proceeds well in excess of one hundred million dollars by selling to IBM his substantial ownership interest in HashiCorp.

85.     Because McJannet is the co-founder and CEO of Dome Systems, Dome Systems knows that McJannet is subject to the various contractual restrictions that he has breached and will continue breaching in his role as CEO. (*See* Counts I-II.)

86.     Through Dome Systems' employment of McJannet, Dome Systems is therefore tortiously interfering with the Holder Agreement by causing and procuring McJannet's wrongful breaches recounted in the allegations of Paragraphs 1 through 60 of the Complaint and in Counts I and II.

87.     If Dome Systems is not enjoined from continuing its tortious interference, IBM will be irreparably injured, inasmuch as McJannet's wrongful breaches of the Holder Agreement impair, diminish, and/or undermine the goodwill that IBM purchased through its acquisition of HashiCorp, and otherwise harm the legitimate business interests of IBM, including the protection of its trade secrets, confidential information, and customer goodwill.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff IBM demands judgment seeking relief against defendants McJannet and Dome Systems as follows:

A.  Imposing a preliminary and permanent injunction ordering McJannet to refrain from:  (a) breaching the terms of his Holder Agreement with IBM, (b) continuing employment with Dome Systems, performing services for Dome Systems, or otherwise

20

associating with Dome Systems prior to the expiration of his three-year non-competition period, (c) soliciting HashiCorp customers, in violation of IBM's rights under the Holder Agreement, for the duration of the three-year non-competition period, and/or (d) soliciting and hiring HashiCorp employees and continuing to employ Holmes, in violation of IBM's rights under the Holder Agreement, for the duration of the three-year non-competition period;

B.  Imposing a preliminary and permanent injunction ordering Dome Systems to refrain from tortiously interfering with McJannet's Holder Agreement with IBM by (i) terminating his employment with Dome Systems, performance of services for Dome Systems, or other association with Dome Systems in violation of the Holder Agreement prior to the expiration of the three-year non-competition period and (ii) preventing McJannet from soliciting HashiCorp customers, in violation of the Holder Agreement for the duration of the three-year non-competition period;

C.  Ordering the tolling and equitable extension of the expiration date of the restrictive periods in the Holder Agreement by a period commensurate with the duration of: (i) McJannet's breaches of the Holder Agreement and (ii) Dome Systems' tortious interference with the Holder Agreement;

D.  Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action;

E.  Awarding IBM monetary damages in an amount sufficient to compensate the Company for McJannet's breaches of contract;

F.  Awarding IBM monetary damages in an amount sufficient to compensate the Company for Dome Systems' tortious interference with McJannet's Holder Agreement with IBM; and

G.  Awarding IBM such further relief as the Court deems just and proper.

Dated:  New York, New York
         May 14, 2026

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  /s/ *Jeffrey J. Recher*
     Jeffrey J. Recher
     Richard C. Tarlowe
     Pietro J. Signoracci
     Scott M. Caravello
     1285 Avenue of the Americas
     New York, New York 10019-6064
     (212) 373-3000
     jrecher@paulweiss.com
     rtarlowe@paulweiss.com
     psignoracci@paulweiss.com
     scaravello@paulweiss.com

     *Attorneys for Plaintiff*
     *International Business Machines Corporation*